**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

FILED

JUL 0 9 2010

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

| | | |
|---|---|---|
| **GENE ATKINS,** | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO.** |
| | § | ~~**A10CA**~~ **515SS** |
| **BERT BELL/PETE ROZELLE NFL** | § | |
| **PLAYER RETIREMENT** | § | |
| **PLAN AND THE NFL** | § | |
| **SUPPLEMENTAL DISABILITY PLAN,** | § | |
| **Defendants** | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

1.   GENE ATKINS, Plaintiff, complains that the Bert Bell/Pete Rozelle NFL Retirement Plan ("NFL Retirement Plan" or "Plan") and the NFL Supplemental Disability Plan ("NFL Supplemental Disability Plan") are liable to him for additional disability benefits because his disabilities arise from his 10-year NFL football career.

2.   The claims administrator for both plans, the Board of Trustees of the Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Board Trustees" or "NFL BoardTrustees"), the body that provides the fiduciary review and makes the final decision on disability claims brought under the Retirement Plan by former NFL players such as Atkins, twice determined that Atkins' disabling impairments were unrelated to his NFL football career. Under a *de novo* standard, these decisions were wrong and a clear preponderance of the evidence indicates that Atkins was and remains totally and permanently disabled as a result of playing

1

NFL football. In the alternative, even if this Court allows the NFL Board Trustees discretion, its decision to deny Atkins football degenerative benefits was an abuse of that discretion.

3.  In addition, the Plan unlawfully discriminates and retaliates against disabled participants such as Atkins who already receive Plan benefits by demanding that they prove by "clear and convincing evidence" that they are entitled to an increase (reclassification) of their disability benefits.  No such heightened evidence requirement is made of non-disabled participants who seek the same classification of benefits under the Plan.  Atkins seeks a declaration that this onerous provision violates 29 U.S.C. 1140 of ERISA, an order voiding the decision made using the clear and convincing evidence requirement (Atkins' 2007 reclassification claim), and an injunction against the NFL Board Trustees which prohibits them from using the "clear and convincing evidence" provision against Atkins in the event that he is not awarded benefits and his claim is remanded to the Board.

## I. PARTIES

4.  Plaintiff Gene Atkins is a resident of Round Rock, Travis County, Texas.

5.  Defendant Retirement Plan can be served with citation by serving the agent for service that is appointed in the plan, the Retirement Board, the joint Board of Trustees for the Retirement Plan, 200 St. Paul Place, Suite 2420, Baltimore, MD  21202-2040.

6.  Defendant Supplemental Disability Plan can be served with citation by serving the agent for service that is appointed in the plan, the Disability Board, the joint Board of Trustees for the Disability Plan, 200 St. Paul Place, Suite 2420, Baltimore MD  21202-2040.

## II. Jurisdiction and Venue

7. The Retirement Plan and Supplemental Disability Plan from which Atkins seeks additional benefits are employee welfare benefit plans subject to ERISA. This court has jurisdiction over this claim for improper classification of disability benefits under 29 U.S.C.A. 1132(e)(1) of the ERISA. Venue is proper in the Western District of Texas, Travis County, in accordance with 29 U.S.C. 1132(e)(2) as Atkins is seeking benefits which the plans are obligated to pay to him at his residence in Round Rock, Travis County, Texas.

## III. Statement Of Facts

### A. Atkins' Career

8. Gene Atkins was born in Tallahassee, Florida in 1964. He attended Florida A&M, which is in Tallahassee, on a football scholarship beginning in the fall of 1983. In 1987, before he graduated from Florida A&M, he was drafted by the New Orleans Saints of the National Football League. Even though he played professional football for the Saints during the years 1987 and 1988, he finished undergraduate school and was awarded a Bachelor of Science Degree from A&M on April 28, 1989. Atkins, one of nine children, was the only one in his family to graduate from college.

9. Atkins played ten seasons in the NFL. From 1987 until 1993, he played safety for the Saints and sometimes returned kick-offs. Then Atkins played safety for the Miami Dolphins until he retired in 1996. During his career, Atkins played in 145 regular season and playoff games, starting in 120 of those games. While in New Orleans, Atkins dislocated his right shoulder four times, underwent surgery in the off-season, and was required to wear a

3

harness to keep his shoulder from popping out.   He also suffered a number of concussions.

10.  Atkins retired in 1996 with serious mental and physical impairments due to his years of playing professional football.

**B.  Atkins Applies for Disability Benefits**

11.  After hearing about the suicide death of Andre Waters, another NFL safety and contemporary of  Atkins, Atkins was finally willing to admit he needed help battling his constant pain and depression and applied for disability benefits with the NFL.  In December of 2004, with the help of his ex-wife Sandra Atkins, Atkins completed his claim for disability benefits, describing three conditions which caused him to be disabled, all of which he attributed to his ten years playing NFL football:

> "1) Unable to lift right shoulder or move arm to functional positions cannot reach up or more than 90 degrees to either side.  Had several dislocated shoulder injuries and eventually had a pin inserted to keep shoulder in place.  The pin was removed in 1996 because of chronic pain in the area.  I have trouble driving because its difficult to turn the steering wheel;

> 2)  Chronic constant pain at the base of head and neck.  Pain sometimes radiates through arms and my hands, feels like plastic.  Everything I touch feels numb and I drop objects I try and pick up. Unbearable pain most days.  I had several stingers while playing but did not feel any affects until I turned 38 years old;

> 3)  Mood swings-because of my inability to function without constant pain, my mood has been effected.  Depression over the physical condition of my body and not being able to work."

12.  Atkins submitted a letter with his application in efforts to further explain his condition.  The last paragraph reads as follows:

> "I suffer from depression, and probably have for several years, but was

4

in denial. I have not sought any medical attention, because of my lack of insurance coverage. I have not been able to work, therefore I am not covered by any insurance. I am now seeking disability income to recover and hopefully get better to where I can function and take care of my children. I am in great need of immediate medical attention and would welcome the opportunity be seen by your physician in order to receive the help I need."

13.   Atkins was then sent to various physicians selected by the NFL Plan administrators, not for needed medical treatment but rather for medical examinations which would aid the Board of Trustees in deciding whether or not Atkins was disabled, and if so, the causes of his disability. The first physician that the NFL asked him to see was Raul Isern, Jr., M.D. in Beaumont. He saw Dr. Isern on January 4, 2005. Dr. Isern never turned in a report to the NFL subsequent to his examination of Atkins.

### 1. Tarek Souryal, M.D.: First Orthopedic Specialist

14.   On January 11, 2005, at the Retirement Plan's request, Atkins was examined by Tarek Souryal, M.D., an orthopedic specialist in Dallas. Dr. Souryal indicated in his report to the NFL, completed on the NFL's physician report form, that from an orthopedic perspective he thought Atkins could perform many tasks which did not involve heavy lifting, including sedentary work, but indicated that "headaches and arm/hand numbness may signify non-orthopedic problem. Should have a neurologic eval." Dr. Souryal indicated that Atkins had impairments to his neck and shoulder, and that these impairments were caused by playing NFL football.

### 2. Keith Kessler, M.D.: First Psychiatrist

15.   On May 16, and May 20, 2005, the Retirement Plan had Atkins examined by

5

Keith Kessler, M.D. a psychiatrist.   Kessler concluded that Atkins was totally disabled as a result of  the following impairments: poor cognitive functioning, chronic pain with depressed mood, chronic headaches, and possible neurologic deficits. Kessler indicated that it was his opinion that the chronic pain with depressed mood, chronic headaches, and possible neurologic deficits were all related to playing football.   Like the orthopedic specialist Dr. Souryal, Dr. Kessler indicated that Atkins should be examined by a neurologist. Dr. Kessler also indicated that Atkins needed to be seen by a pain specialist.

## C.  **The Initial Claims Committee Deadlocks**

16.  After these reports were received, the initial decision-maker for the Plan, the Disability Initial Claims Committee ("Committee"), deadlocked in its decision whether Atkins was disabled.[1]  This was reported to Atkins by letter dated June 15, 2005, which indicated that since the Committee had deadlocked, Atkins' application for disability benefits had been denied by virtue of Plan section 8.6, which provides that "if the members of the Disability Initial Claims Committee are deadlocked with respect to a decision as to whether a claimant is entitled to a benefit, the claim will be deemed denied."

## D.  **Atkins Appeals to the NFL Board of Trustees**

17.  Atkins appealed to the NFL Board of Trustees, which was received by the Trustees on June 24, 2005.   Atkins was then sent to another orthopedic specialist and a neurologist.

---

[1] The Committee has two members, one appointed by the NFLPA and one appointed by the NFL Management Council.

**1.  J. Bryan Williamson, M.D.: Second Orthopedic Specialist**

18.  At the NFL's request, Atkins was examined by J. Bryan Williamson, M.D., an orthopedic specialist in Houston.  Dr. Williamson examined Atkins for approximately 30 minutes and indicated on the NFL's physician report form that Atkins had impairments to his neck, right shoulder, and thumb, all of which were caused by football, but Dr. Williamson indicated that he felt Atkins would be able to engage in a light duty or sedentary occupation.

19.  Williamson summarized Atkins' condition as follows:

> "His right shoulder which gives him pain and discomfort and limited range of motion is directly related to playing football and injuries sustained while playing football.  His neck pain which results from multiple level degenerative disease is related to his position to playing safety and repetitive trauma to his head and neck.  It is important to note that persons of his age can have degenerative change similar to this on a degenerative basis only.  It is felt that playing football in the NFL contributed to the significant degenerative change in his neck and pain in his neck."

20.  About Atkins' severe headaches he said:

> "Overall it is expected his neck and secondary cervical occipital headaches will continue to give him problems and difficulties in the future.  It is unclear that there is any relationship of Mr. Atkins' ability to concentrate or ability to work with others is related to his neck or shoulder problems."

**2.  Raymond Martin, M.D.: First Neurologist**

21.  Also at the NFL's request, Atkins was examined by Dr. Raymond Martin, a neurologist in Houston.  Dr. Martin determined that Atkins was "totally disabled to the extent that he is substantially unable to engage in any occupation for remuneration or profit,", i.e. disabled as that term was defined  by the Retirement Plan.  Dr. Martin indicated that the

impairments which caused Atkins to be disabled were bilateral numbness in hands, frozen right shoulder, neck pain and limited range of motion in the neck, chronic headaches, and memory problems. On the NFL form, Dr. Martin indicated that the numbness in Atkins' hands, his frozen right shoulder, and his neck pain all resulted from playing NFL football. Dr. Martin was unable to say whether Atkins' memory problems were related to football.

22. During this period, Atkins attempted full-time work at a Target store near the apartment in Round Rock, Texas where Atkins, his wife, Patricia, and their sons Jason and Jared lived. His responsibilities were to hang signs and perform other light-duty tasks. Due to crippling headaches, shoulder and neck pain, limited range of motion, and numbness in his hands, he was unable to perform the job requirements and was forced to quit three or four months after being hired.

### E. The NFL Board Trustees Deadlock

23. On October 28th, 2005, approximately 10 months after Atkins had submitted his claim, the NFL Retirement Board advised Atkins that it had deadlocked, just as the Committee had deadlocked in considering his initial claim.[2] Atkins was advised by letter from the NFL that pursuant to plan provision 8.3(a) his claim would be referred to a *Medical Advisory Physician* (*"MAP"*) for a determination of disability that would be binding on the Board.

---

[2]The Board of Trustees has six voting members, three of whom are selected by the NFLPA (National Football League Players' Association) ("Player Trustees) and three of whom are selected by the NFL Management Council ("Management Trustees").

### 1. The *MAP*: Thomas Boll, Ph.D. Neuropsychologist

24. Although the Plan promises that a Board deadlock concerning a player's medical condition may only be broken by the opinion of a physician, denoted a *Medical Advisory Physician* by the Plan, the Trustees decided to break their deadlock by sending Atkins to Thomas Boll, Ph.D. Dr. Boll is not a physician but a neuropsychologist. Atkins was told the following about the examination by Dr. Boll:

> "the Physician will evaluate the impaired body parts you have identified in your application. These are as follows: Head Ache, Numbness, Shoulders, Neck Hands..."

25. After having his assistant administer a test to Atkins by having him answer a long series of questions, Dr. Boll determined that Atkins was totally disabled due to the impairments of illiteracy and borderline mental ability, major depression, and pain. Dr. Boll indicated that his impairments of illiteracy and borderline mental ability were not related to football, that it could not be determined whether Atkins' depression was related to football, but indicated that his debilitating pain was related to football. He advised the NFL that Atkins needed pain management, psychological therapy, and medications.

26. The NFL received Dr. Boll's report on January 8, 2006. It indicated that Atkins' reported twice attempting suicide, the second attempt occurring two months before Dr. Boll's examination. From his application a year earlier, the NFL Trustees knew Atkins was severely depressed and had no health insurance. Atkins pleaded for help with his needed medical treatment in his application for benefits in December, 2004 and his appeal in June of 2005. Despite his pleas, not one representative from the NFL, from December 2004 to the

date of the filing of this complaint, has ever contacted Atkins in an effort to help him receive medical treatment. Instead, Atkins has been left on his own, sometimes going to the free clinic but mostly foregoing treatment, while the NFL Board Trustees have spent a great deal of money litigating their internal dispute over his disability claim.

### F. Atkins' Approved for Inactive Disability Benefits

27. By letter dated February 23, 2006, the NFL Board Trustees notified Atkins that his claim for disability benefits had been approved. Despite Dr. Boll's opinion that some of Atkins' disabling impairments were a result of his professional football career, the Trustees strayed from Dr. Boll's opinion and decided that his disabilities were unrelated to professional football. Accordingly, in the parlance of the NFL Retirement Plan, he was approved for "inactive" total and permanent disability. The Board Trustees found the effective date of disability, i.e. the date disability payments would commence, as being June 1, 2005. The inactive benefit amount was $1,822.50 per month, half of which was paid to Atkins' ex-wife Sandra Atkins.

### G. Atkins Appeals the Board's Classification of his Disability Benefits

28. Atkins was relieved to finally receive a disability benefit ($911.25 per month) from the NFL after more than a year of endeavor but at a loss to understand how the Trustees could decide that his disability was unrelated to playing 10 years of pro football, especially given his symptoms. He promptly appealed the NFL's classification of his disability.

29. Atkins received a letter from the NFL benefits coordinator dated March 21, 2006, acknowledging his appeal and advising him that his appeal would be considered by the Board

during its meeting on May 10th, 2006.  At the May 10th meeting, the Board Trustees decided that they would like the opinion of another neurologist.  The Trustees withheld their decision on Atkins' appeal and sent Atkins to a seventh doctor.

### 1.  Robert Gilbert, M.D.: Second Neurologist

30.  As before, Atkins complied with the NFL's request.  Atkins flew to Atlanta and was examined by neurologist Dr. Robert Gilbert.   Dr. Gilbert conducted a physical exam on Atkins that lasted five to ten minutes.  In the NFL form, Dr. Gilbert found that Atkins was impaired due to R shoulder pain, limited motion; cervical spasm with neck, arm pain; and carpal tunnel, all of which were caused by playing NFL football.  He opined that although Atkins' functional capacity would be limited by pain, he felt that Atkins was not unable to perform some kind of full-time occupation.

### H.  The 2006 Decision: The Board's Denial of Atkins' Appeal for Football-Degenerative Benefits

31.  The NFL Retirement Plan director, Sarah E. Gaunt, sent Atkins a letter dated July 26, 2006, indicating that the NFL Board Trustees  had denied his appeal, and that Atkins' benefits would continue to be classified as inactive benefits.  She indicated that the NFL Board Trustees decision was final.

### I.  Atkins Diagnosed with Severe Post-Concussion Syndrome By Dr. Robert Cantu: First Neurosurgeon

32.  Atkins's depression didn't improve, nor did his constant pain and crippling headaches.  He grew more troubled by what was perceived by him and those close to him, such as his wife Patricia, as a gradual decline in memory, concentration, and cognitive skills.

Knowing his cognitive problems did not stem from illiteracy[3] and a lifelong fourth-grade mentality, as the NFL appointee Dr. Boll alleged, Atkins sought medical help for his condition. He was referred to Dr. Robert Cantu, a neurosurgeon who specializes in post-concussion injury to athletes such as Atkins. After conducting a number of tests on Atkins, Cantu diagnosed Atkins with post-concussion syndrome and chronic traumatic encephalopathy ("CTE"), a progressive trauma-induced brain disease.[4]   Dr. Cantu indicated that Atkins was not able to work due to demented mental status caused by head trauma from playing professional football and that his impaired condition was permanent.

**J. The 2007 Reclassification Claim:**
   **Atkins Files a Claim for Reclassification of**
   **his Disability Based Upon Dr. Cantu's Diagnosis**

33. On August 23, 2007, Atkins, now represented by counsel, requested that the categorization of his disability be reconsidered by the NFL.  Dr. Cantu's records along with other new documents were submitted to the NFL on behalf of Atkins.

1. **Atkins' Reclassification Claim Denied by the**
   **Initial Claims Committee**

34.  By letter dated October 5, 2007, Atkins was informed that the Initial Claims Committee denied Atkins' request for reconsideration and reclassification.  Atkins was advised that he could appeal the Committee's determination.

---

[3]When he was in the third grade, Atkins was found to have dyslexia.  He is a college graduate.  He is not illiterate.

[4]A number of former players have been found to have been impaired by CTE.  This week the Brain Injury Institute announced that the brain tissue of Chris Henry, a 27 year-old wide receiver for the Cincinnati Bengals who died from falling or jumping off the back of a pick-up truck, revealed that he was suffering from CTE. *New York Times*, June 29, 2010.

## K. Atkins Appeals

35. Atkins appealed the Committee's denial and provided additional support for his appeal, including interviews with Atkins and his wife Patricia along with a notice that Atkins had received from the Social Security Administration awarding him total and permanent disability benefits. In addition, he provided a copy of a medical examination that he underwent at the Social Security Administration's request, an examination by neurologist Dr. Ronald DeVere.

### 1. Atkins Found Disabled by the Social Security Administration Due to Frozen Right Shoulder and Post Concussion Syndrome:

36. The decision by the Administrative Law Judge with the Social Security Administration's Office of Disability Adjudication and Review found that Atkins had been disabled since January 1, 1998. The Judge based his decision on the opinion of Dr. Cantu, that Atkins had a declining mental status due to post-concussion syndrome, and the opinion of Dr. Ronald DeVere, a neurologist who examined Atkins in May of 2007 at the government's request. DeVere found that Atkins had a significantly slowed mental functioning, cervical pain disorder, a frozen right shoulder, and numbness and tingling in both hands secondary to involvement of the median and ulnar nerves at the entrapment sight as revealed by an EMG done in 2005.

37. Dr. DeVere's records, five pages, were the only additional medical records submitted with Atkins' appeal. The bulk of the records that supported his request for reconsideration were the same records that had been provided the Committee, the most

significant being the records of Dr. Cantu.

## 2. <u>The NFL Trustees Send Atkins to Seattle to Determine if his Cognitive Loss and Headaches Were Caused by Head Trauma From Playing NFL Football</u>

38. The benefits coordinator for the NFL Plan, Paul Scott, advised by correspondence dated February 15, 2008 that Atkins' appeal of his reclassification claim had been received and that the appeal would be presented to the NFL Board Trustees for decision at their next quarterly meeting on April 30, 2008. Prior to April 30, 2008, no representative of the NFL advised Atkins or his counsel that the Board Trustees needed additional time to decide Atkins' appeal. Instead, Atkins was advised after the NFL Board Trustee meeting on April 30, 2008 that the Board Trustees had tabled their decision of his appeal and wanted Atkins to see another physician. By letter dated June 16, 2008, the NFL Trustees advised Atkins that he needed to see another neurologist, a Dr. James Gordon, located in Seattle, Washington. The letter sent to Atkins by the NFL advised in part as follows:

> "...During your examination, the Physician (Gordon) will evaluate the impaired body parts you identified in your application. These are as follows: CONCUSSIONS, HEADACHES, MEMORY LOSS..."

39. Being the same good soldier that he had been on the football field for 10 years, Atkins complied and went to Seattle to see Dr. Gordon on June 25th, 2008. Dr. Gordon was the third neurologist and the eighth physician who evaluated Atkins at the request of the administrators of the NFL Retirement Plan.

40. The Board Trustees next quarterly meeting was scheduled for July 23, 2008, at which time Atkins' claim was supposed to be decided. Neither Atkins nor his counsel

received any prior notice that an additional extension of time was necessary, as is required under the minimum claim procedures of ERISA. By letter from the Plan Director Sarah Gaunt dated August 6, 2008, Atkins and his counsel were advised that at its July 23, 2008 meeting the NFL Board Trustees again tabled their consideration of Atkins' appeal and advised that the appeal would not be considered until the next quarterly meeting scheduled for November 11, 2008. The Trustees indicated that they needed the extension because they didn't have Dr. Gordon's report.

### 3. Atkins Files Lawsuit

41. In August of 2008, due to the Board's failure to timely render a decision, Atkins filed a lawsuit in this Court, Cause No. A 08 CA 651 SS.

### 4. Dr. Gordon, the Third Neurologist, Determines That Atkins is Disabled as a Result of Head Trauma from Playing NFL Football

42. On September 11, 2008, Dr. James Gordon delivered his report to the NFL Board Trustees. Dr. Gordon determined that Atkins was totally disabled due to cognitive dysfunction and depression, indicating that both of these impairments arose in part as a result of his NFL career. He also determined that Atkins was impaired due to chronic tension headaches and post-concussive headaches, which he also attributed to Atkins' NFL career. Dr. Gordon summarized his findings as follows:

> "It is impossible to distinguish the precise extent to which head injury causes, rather than exacerbates, Mr. Atkins's headaches, cognitive and behavior problems, given preexisting neuropsychological limitations and psychiatric predispositions. What is clear, however, is that he suffers disabling chronic headache, depression, and cognitive limitations, and

that recurrent head trauma resulting from his role as an NFL defensive
back contributed significantly to his current condition, even if that
contribution cannot be reliably quantified. In his current condition, he
cannot be gainfully employed."

**L.   The Board Trustees Deadlock for the Second Time:**
**     The Trustees Refer Their Dispute to an Arbitrator**

43.   Atkins received a letter from the NFL Plan Director on November 20, 2008, which

advised him of the following:

> "At its November 11, 2008 meeting, the Retirement Board of the
> Bert Bell/Pete Rozelle NFL Player Retirement Plan ("Plan")
> considered your appeal from its earlier decision to award you
> inactive total and permanent ("T&P") benefits effective
> June 1, 2005. The Retirement Board was deadlocked on
> the classification issue raised by your appeal. Pursuant
> to provisions of Plan section 8.3(a), the Retirement Board
> referred that issue to final and binding arbitration.
>
> Please note that you are not a party to the arbitration. The
> arbitration is between the members of the Retirement Board
> appointed by the NFL Players Association and the members
> of the Retirement Board appointed by the NFL Management
> Council....."

**1.   Atkins' Lawsuit is Abated, Then Dismissed Without Prejudice**

44.   Atkins' prior lawsuit was answered by the plans then abated, allowing the

arbitration between the Players' Trustees and Management Trustees to proceed. Five status

reports were filed while the arbitration was pending, then the case was dismissed without

prejudice by a stipulation of the parties.

**2.   After 17 Months, the Arbitrator, Relying Upon the**
**     Clear and Convincing Evidence Standard in the Plan,**
**     Finds for The Management Trustees**

45.   The arbitration between the Players Trustees and Management Trustees began on

November 11, 2008, and lasted until April 12, 2010, the date the arbitrator, Robert Kasher,

rendered a decision in favor of the Management Trustees in regards to Atkins' claim for

reclassification.

46. Mr. Kasher summarizes the competing evidence and his decision as follows:

> "Dr. Cantu's opinion is qualified by his finding that Mr. Atkins'
> CTE is based upon a "more probable than not" diagnosis. Such
> an opinion, as well-founded as it is by Dr. Cantu, a highly qualified
> and respected medical practitioner, does not, in this Arbitrator's
> opinion, meet the "clear and convincing" standard of proof required
> to sustain Mr. Atkins' claim.
> ............
> ............
>     Therefore, the resolution of the issues in this case require the
> analysis of the two plausible medical opinions/diagnoses of Gene
> Atkins' cognitive dysfunction.[5]
>     In this Arbitrator's opinion, neither the opinions of Dr. Cantu,
> Gordon and DeVere on the one hand and Dr. Boll on the other rise
> to the level of clear and convincing evidence.  And, as noted above,
> this Arbitrator is bound by that standard of proof.
>     Therefore, Mr. Atkins's claim falls into the realm of "probability",
> as both Doctors Cantu and Boll have implicitly acknowledged."

## 3. The Player Trustees Request Reconsideration

47.   The Board Trustees still have not  rendered a decision on Atkins' 2007

reclassification claim, as the Player Trustees have submitted a request for reconsideration.

---

[5]The opinion contrary to Dr. Cantu and Dr. Gordon was from Dr. Boll, the
neuropsychologist, who believes that Atkins' cognitive dysfunction is not from post-concussion
syndrome but is caused by a combination of functional illiteracy, psychiatric symptoms
consistent with depressive disorder or bipolar disorder, and pain.  Although not a party to the
arbitration between the Player Trustees and Management Trustees, Atkins understands that Dr.
Boll denied the existence of post-concussion syndrome when he testified at the request of the
Management Trustees.

## IV.  THE DECISIONS CHALLENGED

### A.  2006 Board Decision

48.  In this lawsuit, Atkins challenges  the NFL Board Trustee's final decision of July 26th, 2006, which awarded Atkins inactive benefits but denied him football-degenerative benefits. Although the Retirement Plan requires a player to file a lawsuit challenging an adverse Board decision within 42 months of the final decision, which for the July 26th, 2006 final decision would have passed on January 26, 2010, Atkins and the Defendant Plans entered into a tolling agreement, a copy of which is included in the Appendix to this lawsuit, so that Atkins could challenge the 2006 final Board decision.

### 2.  Atkins' 2007 Reclassification Claim

49.  This lawsuit also challenges the second decision, which has not yet occurred.  As of June 30, 2010, the NFL Board Trustees are 596 days late (596 days past the deadline to notify a claimant of a decision on review, as set forth by the U.S. Department of Labor (D.O.L.)) in the Rules and Regulations for ERISA claims procedures (29 CFR § 2560.503-1(i)(1)(ii)).[6]   To challenge the decision on his reclassification claim, Atkins invokes ERISA claims procedure 29 CFR § 2560.503(l), which indicates that he will be deemed to have

---

[6]The NFL Retirement Board indicated that it had received Atkins' appeal of his reclassification claim on February 15, 2008.  Since the Board received all of Atkins' information more than 30 days before its April 30, 2008 meeting and did not advise Atkins prior to April 30th that it needed more time, the Board is actually 2 years and 2 months late in deciding Atkins' claim, but Atkins has given the Board the benefit of any doubt and set the deadline as the third Board meeting following receipt of all of his information, which occurred on November 11, 2008.

exhausted his administrative remedies available under the plan if minimum procedural

requirements are not followed (in this case the failure to timely decide the claim) and may file

suit for benefits.  The NFL Board Trustees have failed to follow a claims procedure that

substantially conforms to the minimum rules for claims procedures as set forth by the D.O.L.

50.    These decisions need to be challenged separately because substantial Plan

violations and ERISA violations occurred with each decision.  The most spectacular violation

that led to the 2006 decision was the Board Trustees' agreement to let a non-physician, a *MAP*

that was not a *MAP*, bind the Board Trustees in deciding Atkins' appeal, and to let the *MAP*

that was not a *MAP* decide medical issues that were outside the scope of authority given him

by the Trustees and the Plan.  Atkins was prejudiced by these plan violations because he was

then required to prove his reclassification claim for football-degenerative benefits by clear and

convincing evidence.

51.    The most spectacular ERISA and Plan violation in regards to his 2007

reclassification claim is that by the end of this month (June, 2010), the Board Trustees are 596

days past the Plan deadline, and the D.O.L. deadline, to notify Atkins of their decision.

## V. RELEVANT PLAN PROVISIONS

52.  The relevant Plan provisions are as follows:

**Definition of Disability**

The plan's definition of disability is as follows:

> 5.2.........An Active Player or a Vested Inactive Player..........
> will be deemed to be totally and permanently disabled
> if the Retirement Board or the Disability Initial
> Claims Committee finds that he has become totally

disabled to the extent that he is substantially prevented
from or substantially unable to engage in any occupation
or employment for remuneration or profit........

## Relevant Disability Classifications

5.1 Total and Permanent Disability Benefits

.........
( c ) (Football Degenerative).  The monthly total and permanent disability benefit
will be no less than $4,000.00 if the disability(ies) arises out of League football
activities, but does not arise while the Player is an Active Player and does
cause the Player to be totally and permanently disabled "shortly after" the disability(ies)
first arises...

(d) (Inactive). The monthly total and permanent disability benefit will be no less
than $1,500.00 if (1) the total and permanent disability arises from other than
League football activities while the Player is a Vested Inactive Player........
...................................
...................................
Notwithstanding the foregoing, a total and permanent disability as a result of
a psychological/psychiatric disorder may be awarded under the provisions of
Section 5.1(a), Section 5.1( c ), or the provisions of Section 5.5 that pertains
to disabilities resulting from a football injury incurred while an Active Player
if the requirements for a total and permanent disability are otherwise met and
the psychological/psychiatric disorder either (1) is caused by or relates to a head
injury (or injuries) sustained by a Player arising out of League football activities
(e.g. repetitive concussions); .......................

## 5.6   Classification Rules

(a) A Player who becomes totally and permanently disabled and who satisfies the
conditions of eligibility for benefits under Section 5.1(a) (active football), 5.1(b)(active
nonfootball), 5.1( c ) (football degenerative), or 5.1(d)((inactive-(nonfootball)), or
Section 5.5(special rules for denials prior to May 6, 1993), will be deemed to continue
to be eligible only for the category of benefits for which he first qualifies, unless the
Player shows by evidence found by the Retirement Board or the Disability Initial
Claims Committee to be clear and convincing that, because of changed circumstances,
the Player satisfies the conditions of eligibility for a benefit under a different category
of total and permanent disability benefits.

## 8.2  Authority of the Retirement Board

20

The Retirement Board will be the "named fiduciary" of the Plan within the meaning of section 402(a)(2) of ERISA, and will be responsible for implementing and administering the Plan, subject to the terms of the Plan and Trust. The Retirement Board will have full and absolute discretion, authority and power to interpret, control, implement, and manage the Plan and the Trust. Such authority includes, but is not limited to, the power to:

      (a) Define the terms of the Plan and Trust, construe the Plan and Trust, and reconcile any inconsistencies therein;

      (b) Decide claims for benefits (except that initial claims for disability benefits will be decided by the Disability Initial Claims Committee, and that the Retirement Board will abide by the provisions of Section 8.3);

      ........

**8.3 Disputes of the Retirement Board**

      (a) Medical Disputes. If the voting members of the Retirement Board are deadlocked with respect to a decision as to (1) whether a claimant is medically substantially prevented from or substantially unable to engage in any occupation or employment for remuneration or profit within the meaning of Section 5.2, or........the Retirement Board may by an affirmative vote of three voting members submit such disputes to a Medical Advisory Physician for a final and binding determination regarding such medical issues.

      (b) Benefit Disputes. If the voting members of the Retirement Board are deadlocked with respect to a decision as to whether or to what extent any person is eligible for or entitled to benefits under this Plan, the Retirement Board may by an affirmative vote of three voting members submit such dispute for final and binding arbitration in accordance with the procedures and practices in use prior to the CBA.

**8.7 Meetings.**
      (a) Retirement Board. The Retirement Board will meet quarterly
      ....................

**8.8 Duty of Care.** The Retirement Board and the Disability Initial Claims Committee will discharge their duties with respect to the

Plan and Trust solely and exclusively in the interest of the Players
and their beneficiaries, and with the care, skill, prudence, and
diligence under the circumstances then prevailing what a prudent
man in like capacity and familiar with such matters would use in
the conduct of an enterprise of like character with like aims.......

**8.9 <u>Discretionary Acts</u>**. ....In exercising their discretion powers under
the Plan and Trust, the Retirement Board and the Disability
Initial Claims Committee will have the broadest discretion permissible
under ERISA and any other applicable laws, and their decisions will be
binding upon all persons affected thereby.

**11.4 <u>Medical Advisory Physician</u>**
(a) Selection.  The NFLPA and Management Council will jointly
designate one or more board-certified orthopedic physicians as
a Medical Advisory Physician (MAP).  The NFLPA and Management
Council also may, at their discretion, jointly designate a physician
in another medical discipline as a MAP.  Any MAP so designated
by the NFLPA and Management Council also may, at their discretion,
jointly designate a physician in another medical discipline as a MAP....

(b) Duties.  A MAP has authority to decide only those medical issues
submitted by the Retirement Board under Section 8.3(a)..........A
MAP will submit a written determination to the Retirement Board
on a form provided by the Retirement Board....

**11.6 <u>Claims Procedure.</u>**
(a) Disability Claims Received on or after January 1, 2002......
.....................................................
.....................................................
Decisions by the Retirement Board on review will be made no later
than the date of the Retirement Board meeting that follows the Plan's
receipt of the Player's request for review, unless the request for review
is received by the Plan within 30 days preceding the date of such
meeting.  In such case, the Retirement Board's decision may be made
by no later than the second meeting following the Plan's receipt of the
request for review. If special circumstances require a further extension
of time for processing, a benefit determination will be rendered not
later than the third meeting of the Retirement Board following the
Plan's receipt of the request for review.  If such an extension of time
is required, the Retirement Board will notify the Player in writing of
the extension, describing the special circumstances and the date as of

which the benefit determination will be made, prior to the commencement of the extension.

## <u>Supplemental Disability Plan</u>

"...You will receive supplemental disability benefits from this Disability Plan only if and while you are receiving total and permanent disability benefits from the Retirement Plan in one of these three categories:

- Active Football......
- Active Nonfootball......
- Football Degenerative (same as the retirement plan

A person who is receiving total and permanent disability benefits in one of the above categories from the Retirement Plan is referred to in the Disability Plan and in this booklet as an "Eligible Player." If you are receiving total and permanent disability benefits from the Retirement Plan in the "Inactive" category (Retirement Plan Section 5.1(d)), you are not eligible for disability benefits under this Disability Plan....

Under the Retirement Plan, your total and permanent disability benefits are converted to retirement benefits when you reach the Retirement Plan's Normal Retirement Date (the first of the month after your 55th birthday). This conversion process has no effect on your Disability Plan benefits. Disability Plan benefits will continue to be paid after the conversion, so long as you are totally and permanently disabled. Such Players are also referred to in the Disability Plan and in the booklet as "Eligible Players."

.......

......

If you are an Eligible Player, you will receive a benefit as set forth below

.......

......

Football degenerative Retirement Plan Section 5.1( c )

........

....

beginning March 1, 1997-$4,335.00 per month

from April 1, 2000 through the end of the 2006 season-$5,167.00 per month

............The determinations by the Retirement Plan as to whether you are totally and permanently disabled and your total and permanent disability category are final and binding on the Disability Board. ....................

.........................

23

The Disability Plan stops making monthly payments when you die.....

## VI. **STANDARD OF REVIEW**

### A. *De Novo* **Review of the 2006 Board Decision**

#### 1. **In Violation of the Plan, the Decision by Which The Board Agreed to be Bound was not Made by a *MAP***

53. This court should review this matter under a *de novo* standard rather than an abuse of discretion standard because of the substantial procedural violations and plan violations that the NFL Board Trustees have committed during the pendency of Atkins' claim. The most glaring error was deferring this matter to a non-physician in 2006 for a binding determination. The Plan promises that when the board is deadlocked with respect to a medical decision, the matter will be referred to a *Medical Advisory Physician* ("*MAP*"), who will be a board certified orthopedic physician, or the NFLPA and Management Council's may jointly designate a physician in another medical discipline as a *MAP*. Dr. Boll is neither a orthopedic physician nor is he a physician in another medical discipline. This misapplication of the *MAP* provision within the Plan tainted the decision-making process and prejudiced Atkins in regards to his claim that his disabilities were caused by playing NFL football. Since the Board Trustees violated this material provision of the Plan, it cannot then enforce the provisions of the Plan giving it discretionary authority. Atkins' later request for reclassification was prejudiced by this breach of the Plan as well. Other than striking Dr. Boll's opinions, relief which Atkins requests later in this complaint, *de novo* review is the only way to unwind the prejudicial effect of violating the *MAP* provision of the Plan.

### 2. Dr. Boll's Opinions Were Beyond the Authority Given by the NFL Board Trustees

54.   The violation of the Plan was compounded when Dr. Boll did not decide the medical issues which were submitted by the NFL Board Trustees.  Under 11.4(b) of the Plan, he was required to limit his opinion to the following medical issues which the Board submitted to him:

> "the Physician will evaluate the impaired body parts you have identified in your application.  These are as follows: Head Ache, Numbness, Shoulders, Neck Hands..."

55.   Although Dr. Boll did report that the pain impaired Atkins, and also reported that he had significant dexterity difficulties, the remainder of his report (and testimony on behalf of the Management Trustees) is beyond the authority given him by the Board Trustees and the Plan.

### 3. No Discretion Because the Board Trustees Abdicated Their Discretionary Role When They Sent the Matter to Dr. Boll for a Binding Opinion on the Medical Evidence

56.   In addition, no discretion should be granted the Board Trustees for their 2006 decision because the Board Trustees abdicated their discretionary role to Dr. Boll.  Dr. Boll was not a fiduciary under the Plan and had no discretionary authority under the Plan to finally decide Atkins' claim.  No discretion was exercised in the NFL Board Trustees' 2006 decision.

## B. *De Novo* Review of the 2007 Reclassification Claim

### 1. Substantial Procedural Violations: Failure to Decide Atkins' Appeals in a Timely Manner

57.   The NFL Board Trustees violated the minimum procedural requirements for deciding appeals of disability claims not once, not twice, but three times.  The final time violation may be record-setting in terms of delay.

58.   In regards to the timing of a notification of benefit determination on review of a disability claim, the applicable ERISA regulation requires as follows:

> "**29 C.F.R. S 2560.503-1(i)(3)(ii)** In the case of a multiemployer plan with a committee or board of trustees designated as the appropriate named fiduciary that holds regularly scheduled meetings at least quarterly, paragraph (i)(3)(i) of this section shall not apply, and the appropriate named fiduciary shall instead make a benefit determination no later than the date of the meeting of the committee or board that immediately follows the plan's receipt of a request for review, unless the request for review is filed within 30 days preceding the date of such meeting.  In such case, a benefit determination may be made by no later than the date of the second meeting following the plan's receipt of the request for review.  If special circumstances (such as the need to hold a hearing, if the plan's procedures provide for a hearing) require a further extension of time for processing, a benefit determination shall be rendered not later than the third meeting of the committee or board following the plan's receipt of the request for review. If such an extension of time for review is required because of special circumstances, the plan administrator shall notify the claimant in writing of the extension, describing the special circumstances and the date of which the benefit determination will be made prior to the commencement of the extension."

59.   The Summary Plan Description ("SPD") of the Plan tracks this regulation, making this unqualified promise to the players:

> "**Benefit Claim and Review Procedures-Disability Benefits**
>
> ..............
> ...............
> The Retirement Board ordinarily will make a decision on your

26

request for review at its next meeting, or at the second meeting following receipt of your request for review if your request is received less than 30 days before the next meeting. However, if special circumstances exist, such as the need to obtain further clarifying information, the review may be delayed but will be made by no later than the third Retirement Board meeting following your request for review........"[7]

There is no exception for a Board decision that is the product of an arbitration implemented to break a Board deadlock.

60.  Atkins' first appeal was received by the Board Trustees on June 24, 2005.  The appeal was required to have been decided at the October 20th, 2005 Trustee meeting but was not decided until February 23, 2006.  This was the first violation.

61.  The Board Trustees  received Atkins' appeal of the determination that he was entitled to inactive benefits rather than football-degenerative benefits by March 20, 2006.  The decision was required to be made by May 10th, 2006, which was the next meeting of the Trustees.  The decision was not made until July 26, 2006.  This was the second violation.

62.  The benefits coordinator acknowledged receiving Atkins' appeal of his 2007 reclassification claim on February 15, 2008.  The appeal hasn't been decided yet.  As of June 30, 2010, the NFL Board Trustees are 596 days past the deadline to decide the claim, a deadline which the D.O.L. describes as a *minimum* requirement for a fair claims procedure. Even if extensions of time were granted the Board Trustees, the latest they could decide the claim was November 11, 2008.  This is not substantial compliance with ERISA regulatory requirements nor does it comply with the time requirements for a Board Trustee decision as

---

[7]April 2005 SPD of the NFL Retirement Plan, page 32.

promised by the Plan and the SPD of the Plan.

63. This flagrant procedural violation alone merits the change of the standard of review from abuse of discretion to de novo review.[8]

### 2. No Discretion Exercised in Second Final Benefit Determination: Therefore No Deference Should Be Granted

64. Atkins' 2007 reclassification claim should also be decided *de novo*, since by virtue of a deadlock the Board Trustees again abdicated their role as discretionary decision-maker and instead referred the matter to an arbitrator for a decision that would bind them. Neither the Plan nor the SPD transfers discretionary authority from the Board Trustees to a chosen arbitrator. The arbitrator's powers are limited to resolving an intractable disagreement between Board Trustees.

### 3. Atkins' 2007 Reclassification Claim is Deemed Denied: Therefore No Discretion Should be Granted

65. Since Atkins must invoke ERISA claims procedure 29 CFR § 2560.503(l), which indicates that he will be deemed to have exhausted his administrative remedies available under the plan if minimum procedural requirements are not met, he is entitled to *de novo* review of his claim, as the Board Trustees may only preserve discretion for their final decision if they exercise it within the time requirements allowed by the Plan and ERISA regulations.

### 4. The Clear and Convincing Evidence Standard

---

[8]The courts have found that discretionary clauses don't withstand the time requirements for deciding a claim. Recently the 10th Circuit decided that 110 days after the regulatory deadline is not substantial compliance with ERISA time requirements and merits a de novo review of the claim, even if there is discretionary language in the policy or plan. *LaAsmar v. Phelps Dodge Corporation et al.*, Nos. 07-1267, 07-1286, filed May 6, 2010.

**Should Not Be Applied To 2007 Reclassification Claim
Because of Procedural Violations**

66.  In regards to the 2007 reclassification claim, the clear and convincing evidence standard under 5.6 of the Plan should not be applied as the Board Trustees violated the time provisions of ERISA and the Plan, as well as the *MAP* provisions of the Plan.  The NFL Board Trustees cannot freely violate certain Plan provisions and then enforce others at their whim.

**Abuse of Discretion Standard**

67.  Although Atkins' benefits claim should be decided under a *de novo* standard of review for the reasons previously noted, if it is decided by an abuse of discretion standard, the NFL Board Trustees' decision to deny benefits must be based upon evidence, even if disputable, that clearly supports the bases for denial.[9]  There must be some concrete evidence in the administrative record that supports the denial of the claim; if there is no concrete evidence in the record, the Court must find that the administrator abused its discretion in denying or terminating benefits.[10]  Both the 2006 decision as well as the 2010 deemed denial of the 2007 reclassification claim were abuses of any discretion which the Board Trustees are found to have retained.

68.  The NFL Management Trustees have a conflict of interest when they decide benefit claims, since paying additional benefits will require a greater contribution to the Trust by the NFL teams, which will have a negative impact on their profitability.  This conflict should be

---

[9]Id, at 342, quoting *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 299 (5th Cir. 1999)

[10]*Vega*, supra, at page 302.

considered significant when the court reviews the Management Trustees' decision, as this conflict has historically impaired their ability to fairly decide claims and impaired their ability to fairly decide Atkins' claim.

## VII.   CAUSES OF ACTION UNDER ERISA

### A.  Benefits Claim Under 29 U.S.C. 1132(a)(1)(B)

#### 1. *De Novo* Review

69.  Atkins brings this cause of action for benefits under 29 U.S.C.A. 1132(a)(1)(B) of ERISA.  Any discretion which the Plan might have reserved for the NFL Board Trustees was lost by not being exercised (both by abdicating discretion to Dr. Boll and the arbitrator Mr. Kasher and also by not deciding the claim within the time allowed by the Plan and ERISA regulations), and this dispute is subject to *de novo* review by this Court.  The preponderance of the evidence supports Atkins' claim that his disabilities arise from playing NFL football. The Board Trustees' decisions of July 26, 2006 and the deemed denied decision of 2010 were breaches of both the NFL Retirement Plan and the Supplemental Disability Plan.

#### 2. Abuse of Discretion

70.  In the alternative, if this matter is decided under an abuse of discretion standard, the NFL Board Trustees did not have substantial evidence to support their decisions of July 26, 2006 and their deemed denied 2010 decision that Atkins' disability did not arise out of playing in the NFL.  The Trustees' conflict of interest should be considered a significant factor if the Court still allows the Trustees discretion in deciding Atkins' claim.

#### 3. Failure to Follow Dr. Boll's Decision

71.  In the event Dr. Boll's opinions are not stricken, the Board Trustees' decision to

cherry pick some of Dr. Boll's opinions and discard others was in violation of the Plan under any standard of review that might be adopted. Dr. Boll indicated that Atkins suffered disabling impairments due to the following conditions: 1) illiteracy and borderline mental ability, unrelated to football, 2) major depression, possible Bipolar disorder, its relation to football unknown, and 3) pain caused by playing football. Dr. Boll indicated that pain played a significant role in Atkins' disability because he indicated that in order for Atkins to work again in the future, he would need pain management as well as psychological therapy and medications.[11] The Board latched on to Dr. Boll's opinion regarding illiteracy but discarded his opinions regarding Atkins' pain. This was impermissible under the Plan, which promises that when disabilities arise out of NFL football activities, a player will be paid football degenerative benefits.

72. For this reason, if the Court allows Dr. Boll's opinions to be part of the record, then the Court should find that the Board Trustees breached the plan, or abused their discretion, when they did not follow Dr. Boll's complete medical opinion. It was Dr. Boll's opinion that many of Atkins' impairments that rendered him disabled arose from NFL football activities.

**B. Declaration of Rights Under 29 U.S.C. 1132(a)(1)(B) and Injunction Under 29 U.S.C. 1132(a)(3) Due to a Violation of 29 U.S.C. 1140**

73. In conjunction with his benefits claim, Atkins seeks a declaration of rights under 29 U.S.C. 1132(a)(1)(B) and an injunction under 29 U.S.C. 1132(a)(3). The Plan provision

---

[11]Dr. Boll said nothing about sending Atkins back to school to defeat his alleged illiteracy, which seems to indicate that he felt Atkins' pain and mental/emotional disorders were the primary reasons Atkins could not engage in full-time work.

that requires a disabled player to prove by "clear and convincing"evidence that his benefits should be reclassified unlawfully retaliates and discriminates against certain participants of the Plan, namely those like Atkins who are disabled and being paid benefits under the Plan.

74.   Under 1140 of ERISA it is unlawful for any person to discriminate or retaliate against a person for exercising rights under an ERISA plan.  The "clear and convincing" evidence standard of the Plan discriminates and retaliates against disabled players who are already being paid Plan benefits (i.e. who have already exercised rights under the Plan), demanding that they meet a higher standard of proof than non-disabled participants (those who haven't exercised rights under the Plan) to achieve the same level of benefits.  This provision is especially harmful to players like Atkins who suffer traumatic brain injuries, where the disabling symptoms are clear but there is no contemporaneous diagnosis.[12]  It compels players impaired by brain trauma to suffer silently with their impairments until a firm diagnosis and the connection to football has been made, or else, like Atkins, get burned.[13]

75.   Under 29 U.S.C. 1132(a)(1)(B), Atkins seeks a declaration that this onerous provision violates 29 U.S.C. 1140 of ERISA.  Further, under 29 U.S.C. 1132(a)(3) he seeks

---

[12]Atkins is not alone.  Take the case of Iron Mike Webster, a man that earned four Super Bowl rings.  He suffered multiple concussions while playing center for the Pittsburgh Steelers.  Although beginning in 1995 he contacted the Board a number of times to try and file a claim for disability benefits, it was not until 1999 that he was able to complete a disability claim.  He was not diagnosed until 1998 with brain damage resulting from multiple head injuries incurred while playing football, but his inability to function sufficiently to hold a job had manifested itself much earlier.  In 1996 Webster had a psychiatric evaluation, which occurred at the encouragement of former teammates after he was found sleeping in a train station.  At that time Webster reported that he had been living in hotels and out of his car the last 3 and ½ years.  Facts taken from *Jani v. Bell Retirement Plan*, 209 Fed. Appx. 305, 2006 WL 3623047 (C.A. 4 (Md.))

[13]Currently, CTE can only be diagnosed with certainty by examining brain tissue after a player's death.  *New York Times*, June 29, 2010.

an order voiding the decision made using the clear and convincing evidence requirement (Atkins' 2007 reclassification claim), and an injunction against the NFL Board Trustees which prohibits them from using the "clear and convincing evidence" standard.  If benefits are not awarded Atkins, then this matter must be remanded and the Board be instructed that it may not use the "clear and convincing" evidence standard in deciding his reclassification claim.

## VIII.  RELIEF REQUESTED

### A. Benefits

76.  The evidence shows that Atkins has been disabled as a result of playing NFL football from January 1, 1998 to the present.  The Social Security Administration found him impaired due to frozen right shoulder and post-concussion syndrome and awarded him benefits beginning January 1, 1998.  Atkins should be paid $4,000.00 per month under the NFL Retirement Plan from January 1, 1998 forward (category: football degenerative benefits). Under the NFL Supplemental Disability Plan, Atkins should be paid $4,335.00 per month from January 1, 1998 until April 1, 2000, and after April, 2000, he should be paid $5,167.00 per month under the Supplemental Plan(football degenerative benefits).[14]

77.  Therefore, from January 1, 1998 until April 1, 2000 (27 months), Atkins should have received $4,000 from the Retirement Plan and $4,335 from Supplemental Disability Plan per month.  The sum, $8,335, must be reduced by 25% because Atkins obtained an early

---

[14]The NFL Supplemental Disability Plan's schedule of benefits provides for a number of increases in each category of benefits, including an increase for football degenerative benefits effective April 1, 2000 that is reflected in this calculation.

withdrawal of his retirement benefits.[15]   After the 25% reduction, the monthly amount due

Atkins from January 1, 1998 until April 1, 2000 was $6,251.25 per month. The total sum due

him for this period is $168,783.75.

78.   Beginning April 1, 2000, his monthly benefit from the plans should have been

$9167 per month ($4,000 under the Retirement Plan and $5,167 under the Supplemental Plan),

reduced by 25% due to his early withdrawal of retirement benefits. The net monthly benefit

owed Atkins was $6,875.25. Atkins should have received this amount every month from April

1, 2000 until June 1, 2005,  the date when he started receiving inactive benefits under the

Retirement Plan. This period spans 62 months.  Therefore, for this second period, Atkins is

owed the sum of $426,265.50.

79.   The calculation changes as of June 1, 2005 because at that time Atkins was

awarded inactive benefits by the NFL. From June 1, 2005 forward Atkins is owed $6,875.25

per month instead of $2,430.00, the amount he has been paid under the Retirement Plan for

inactive benefits.   Therefore, the net amount he is owed is $4445.25 per month from June 1,

2005 to the present. From June 1, 2005 until October 1, 2010, a span of 64 months, he is owed

the sum of $284,496.00 in back benefits.

80.   Combining these three benefit periods, he is owed the sum of $879,545.25 in back

benefits as of October 1, 2010.    Atkins  prays  for back benefits in the amount of

$879,545.25.

81.   In the alternative, should this Court find that even though he has been disabled as

---

[15]The plans provide that an early withdrawal of retirement benefits will reduce disability
benefits by 25%.

a result of playing NFL football since January 1, 1998, he is limited by his application to benefits from December 6, 2004 forward (the date of his application), Atkins is entitled to the sum of $325,747.50 in back benefits (Dec. 2004 until June, 2005 at the rate of $6875.25 per month and June 1, 2005 until October 1, 2010 at the rate of $4,445.25 per month).

82. He also prays for monthly benefits after November 1, 2010 at the rate of $6,875.25 per month until the time of judgment.

**B. Declaratory and Injunctive Relief**

83. Under the authority of 29 U.S.C. 1132(a)(1)(B), Atkins seeks a declaration that the "clear and convincing" evidence Plan provision is a violation of 29 U.S.C. 1140, since it discriminates against disabled participants of the Plan vis a vis non-disabled participants, and retaliates against claim filers vis a vis those that haven't filed claims. Atkins requests that the 2010 decision on his reclassification claim be rendered void because it is based upon this illegal provision, and under 29 U.S.C. 1132(a)(3) Atkins prays that the NFL Board be enjoined from requiring him to prove his reclassification claim by clear and convincing evidence.

**C. Request to Strike or Limit Opinions of Dr. Boll**

84. Atkins requests that Dr. Boll's opinions be struck from the administrative record for two reasons:

> 1) He is not a physician yet he was hired by the Board as a *MAP, Medical Advisory Physician,* and asked to render a binding decision in regards to Atkins' condition-this was in contradiction to the plain language of the Plan and resulted in prejudice to Atkins when the Board relied upon his opinion; and
>
> 2) the plan provides that Dr. Boll's authority was limited to **only** those medical issues submitted by the Board-the Board

limited the scope of Dr. Boll's opinions to the medical issues of Atkins' headaches, numbness, shoulders, neck, and hands. Dr. Boll provided opinions outside of the authority granted him by the Plan and the Board improperly relied upon those opinions that were outside of his authority-this violation of the plan terms also prejudiced Atkins.

85.  In the alternative, this Court should limit Dr. Boll's opinions to only those medical issues that were submitted to him by the Board Trustees, namely, the question of Atkins' impairments and disability due to "headaches, numbness, (and problems with) shoulders, neck (and) hands" and strike the remainder of his opinion.  This limitation includes his later testimony for the Management Trustees in regards to Atkins' reclassification claim, as his medical opinions fell outside of the authority given him by the Board Trustees.

**D.  Striking the Arbitration Decision From the Record**

86.  The arbitration decision by Mr. Kasher should be stricken from the administrative record because it is based upon the clear and convincing evidence standard within the Plan. This provision is unenforceable and should not have been applied by either the fiduciary Board Trustees nor the arbitrator, as it retaliates against those who have already filed claims,  and discriminates against disabled players who seek a different category of benefits.  This is a violation of 29 U.S.C. 1140 of ERISA actionable under 29 U.S.C. 1132(a)(1)(B) and 29 U.S.C. 1132(a)(3).

**E.  In the Alternative, Remand**

87.  If he is not awarded benefits, then Atkins prays that this matter be remanded and that the Board Trustees be enjoined from using the "clear and convincing evidence" standard, and that the Court specifically find that the arbitration ruling cannot be part of the record as it

relied upon the unlawful clear and convincing evidence standard.  Atkins also prays that Dr. Boll's opinions be struck from consideration on remand or else limited to the physical impairments which the Board asked him to consider, as neither the Plan nor the Board Trustees gave him authority to decide other medical issues, such as cognitive impairment due to brain trauma from NFL football.

## IX. ATTORNEY'S FEES

88.  In addition, Atkins prays for his attorney's fees and costs under 29 U.S.C.A. 1132(g) under his benefit claim, under his injunction claim, and also under his claim for remand.

## PRAYER

89.  Wherefore, premises considered, Atkins prays for past due football degenerative benefits, both under the NFL Retirement Plan and the NFL Supplemental Disability Plan.  In addition, Atkins prays for equitable relief, that the Court engage in a de novo review of Atkins' claim, declaratory relief, that the "clear and convincing evidence" standard be found unlawful, and injunctive relief, that the NFL Board be enjoined from using the clear and convincing evidence standard and that Dr. Boll's opinions be limited or be stricken.

90.  If Atkins is not awarded football degenerative benefits, then, in the alternative, Atkins prays for the same declaratory and injunctive relief requested in the preceding paragraph and that this matter be remanded.

91. Atkins prays also for reasonable and necessary attorney's fees incurred in bringing this action, and for pre-judgment and posts-judgment interest, and such other and further

equitable relief to which he may show himself to be justly entitled.

Respectfully Submitted,

**HARKINS, LATIMER & DAHL, P.C.**
405 N. St. Mary's Street, Suite 242
San Antonio, Texas 78205
(210) 527-0900 (Telephone)
(210) 527-0901 (Facsimile)

By: _____
**JEFFREY E. DAHL**
State Bar No. 05310900
**ATTORNEYS FOR PLAINTIFF
GENE ATKINS**